# Exhibit A

## Detention Hearing Transcript

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3


 4     United States of America,      )
                     Plaintiff,       )
 5                                    )
                                      )
 6     vs.                            )   Case No. 24-cr-10281-IT-2
                                      )
 7                                    )
       Joan Avalo-Quezada,            )
 8                   Defendant.       )


 9


10     BEFORE:  The Honorable Chief Magistrate Judge Donald L. Cabell


11


12                            Detention Hearing
                              (Digital Recording)

13


14


15


16                                   United States District Court
                                     1 Courthouse Way
                                     Boston, Massachusetts
17                                   September 5, 2024


18


19


20


21


22


23                        Marianne Kusa-Ryll, RDR, CRR
                             Official Court Reporter
                          United States District Court
24                          595 Main Street, Room 514A
                             Worcester, MA 01608-2093
25                       508-929-3399 justicehill@aol.com
                        Mechanical Steno - Transcript by Computer
```

```
 1    APPEARANCES:

 2    United States Attorney's Office
      Michael J. Crowley, Assistant U.S. Attorney
 3    John Joseph Moakley United States Courthouse
      1 Courthouse Way
 4    Boston, Massachusetts 02210
      on behalf of the Government
 5
      Benzaken and Wood, LLP
 6    Jason G. Benzaken, Esquire
      1342 Belmont Street
 7    Suite 102
      Brockton, Massachusetts 02301
 8    on behalf of the Defendant

 9

10

11

12              Proceedings recorded by sound recording
                and produced by computer-aided stenography
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          E X H I B I T S

2

No._____    Description_____ _____        Page

3

1          Picture of Infiniti pulling out of

4          parking lot                                      5

5      2          Picture of Infiniti leaving the area
           at 9:00 p.m.                                     5
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2            (The audio recording begins at 03:05:00 p.m.)

 3            THE CLERK:  This is the case of United States versus

 4    Joan Avalo-Quezada, Criminal Action No. 23-10186 and

 5    24-mj-1056, will now be heard before this Court.

 6            Would counsel please identify themselves for the

 7    record.

 8            MR. CROWLEY:  Good afternoon, your Honor.  Michael

 9    Crowley on behalf of the United States.

10            THE COURT:  Good afternoon.

11            MR. BENZAKEN:  Good afternoon, your Honor.  Jason

12    Benzaken for Mr. Avalo-Quezada.

13            THE COURT:  Good afternoon.

14            And good afternoon, Mr Avalo-Quezada.

15            THE DEFENDANT:  Good afternoon, your Honor.

16            THE COURT:  Okay.  All right.  So we are here on the

17    government's motion for detention and defendant's request for

18    release.

19            I understand we are arguing by proffer?

20            MR. CROWLEY:  That's correct, your Honor.

21            THE COURT:  All right.  I have received the report

22    from Pretrial Services.  I assume the parties have as well.

23            I do have also at least one letter that has been

24    submitted in support of Mr. Avalo-Quezada.

25            And with that, I will hear from the government.
</pre>

1          MR. CROWLEY:  Your Honor, we just have two -- two

2    exhibits that -- everything else will be verbally proffered,

3    but we've already provided these to the defense.

4          Just so the Court has them --

5          THE COURT:  Okay.

6          MR. CROWLEY:  -- as demonstratives, Exhibits 1 and 2.

7          THE COURT:  Okay.  Mr. Benzaken, no objection to these

8    being considered for purposes of the bail hearing?

9          MR. BENZAKEN:  No, your Honor.

10          THE COURT:  All right.

11          And, Mr. Crowley, I imagine you will explain what

12    these are?

13          MR. CROWLEY:  Yes, your Honor.

14          THE COURT:  Okay.

15          MR. CROWLEY:  So we don't -- we believe release is not

16    appropriate given the -- the multiple grounds we've cited, but

17    primarily danger and obstruction of justice.

18          The defendant, as is noted in the defense motion, the

19    defendant is charged in two separate crimes, the racketeering

20    crime involving the Heath Street Gang, as well as a stand-alone

21    drug trafficking crime that crosses over on that.

22          THE COURT:  Uh-huh.

23          MR. CROWLEY:  The drug trafficking crime -- well,

24    actually, we'll do the racketeering first --

25          THE COURT:  Uh-huh.

1          MR. CROWLEY:  -- because temporally, the significant

2     acts are kind of linked to each other.

3          On the racketeering crime, the -- one of the primary

4     sentencing enhancements that the defendant will face, we

5     believe there's significant evidence to -- for his involvement

6     in the gang.

7          One of the primary ones is the murder that occurred on

8     January -- excuse me -- June 7, 2021 --

9          THE COURT:  Uh-huh.

10          MR. CROWLEY:  -- of FB.

11          In that case, the murder took place at approximately

12     8:41 p.m.  It was committed by a minor.  We believe we can show

13     at trial that that minor was dropped off by other Heath Street

14     Gang members; that that minor then walked through four separate

15     neighborhoods; and what we believe we can show at trial was

16     that minor hunting a rival gang member to shoot.  So basically

17     sent off on his own to go do an attack.

18          That minor eventually reached the area of the Mission

19     Hill projects.  When he got there, he encountered Mr. Baez, who

20     was not a gang member.  And then multiple shots were fired.

21     Mr. -- the -- the victim died on-site.

22          We would be able to show that the defendant was

23     involved as a coconspirator.  On that front at approximately

24     8:37 p.m., which is four minutes before the shooting occurred,

25     a vehicle, the defendant was observed by video at the Heath

1    Street projects in a vehicle with codefendant Keonte Campbell,

2    which is a rented Infiniti in a parking spot at 275 Center

3    Street.  They -- both individuals just sat in the vehicle.  So

4    this is four minutes before the shooting.

5         After the shooting, the shooter, who's a minor, made

6    his way back to the Heath Street projects at 8:54 p.m.  That

7    shooter is reported walking up to the vehicle that had the

8    defendant and Mr. Campbell in it.

9         The shooter is seen looking at his phone, consistent

10   with trying to figure out which vehicle it was.  He then got in

11   the vehicle.  There are text messages recovered from the

12   shooter's phone communicating with another Heath Street Gang

13   member about traveling to that individual's location in Quincy.

14   We'd note that the Infiniti in which they were in then started

15   to pull out of the parking lot.

16        Exhibit 1 is a picture of that Infiniti pulling out of

17   the parking lot and the defendant, Mr. Avalo, leaving it with

18   something wrapped in white.  We believe that we can argue

19   persuasively that was the firearm used.

20        THE COURT:  Okay.

21        MR. CROWLEY:  Now, Mr. Avalo leaves the Infiniti, gets

22   back into the Infiniti.  That's at between 8:59 and 9:00 p.m.

23        And Exhibit 2 is the Infiniti leaving the area at nine

24   o'clock.  So within a matter of six minutes of the -- of the

25   shooter arriving at the Heath Street project, he was leaving it

1   with Mr. Avalo and Keonte Campbell going to Johnnie Baskin's

2   location in Quincy, consistent with the conspiracy to commit

3   murder that Mr. Avalo was facilitating it and did so by waiting

4   with Mr. Campbell to take the shooter out of the area where he

5   had just executed an individual on Mission -- in the Mission

6   projects.

7           We have shown additional evidence to -- excuse

8   me -- the defense counsel.  I'm not going to provide an exhibit

9   on it given the sensitive nature, but the defense counsel also

10   has the phone from which it was recovered.

11          On July 26, 2021, the phone from Mr. Avalo, while it

12   was -- had on it notes, so this is approximately six weeks

13   after the shooting.  Both notes were three addresses.  Those

14   addresses are consistent with the home locations of three

15   potential witnesses in the case.

16          So we believe that's consistent with Mr. Avalo having

17   information about people who would testify against the murderer

18   and had that on his phone in July of 2021.

19          So as to that act we would -- he's highly dangerous.

20   It shows his complete integration with the Heath Street Gang

21   and its violence, and that's further shown that -- so this

22   occurs in June and July.  His drug trafficking then picks up,

23   the big drug trafficking case, the fentanyl case, starts in

24   August where he meets -- and the Court's already reviewed

25   his -- his complaint affidavit on that.  He basically arranged

1    with the other codefendants in that case to distribute fentanyl

2    in an operation that his brother had set up in Maine.

3              And during that -- excuse me -- for the next -- for

4    the period of approximately August through December, at the

5    very least, the defendant engaged in trafficking fentanyl to

6    Maine.

7              On that front, the defendant was subsequently arrested

8    in December of 2021.  When he was arrested in a vehicle there

9    was a box in the pouch, the pocket of the vehicle in front of

10   the defendant.  In that was 67 grams, approximately, of

11   fentanyl and cocaine consistent with his drug trafficking, but

12   the multiple calls recovered from his phone that was seized

13   that day, that's also the phone that provided the information

14   about the contacts for the witnesses, potential witnesses in

15   the murder, that on that date the -- that phone showed

16   approximately three and a half months of consistent messaging

17   that the defendant was moving over 400 grams of fentanyl into

18   Maine.

19             Just looking at the sections of the complaint

20   affidavit that involves Mr. Pimentel, who is supplying the

21   defendant with cut and fentanyl, those communications alone

22   exceed 500 grams of fentanyl the defendant was trafficking to

23   Maine.

24             But as part of that we have provided the

25   defendant -- defendant's counsel has the text message we

1    pointed out today.  Not only was the defendant trafficking

2    fentanyl to Maine, but at one point the defendant had an issue

3    where he texted one of the -- his codefendants in that case

4    about a woman who had, quote, tricked me into giving her three

5    fingernails saying he was working with her.  That's consistent

6    with fingers of fentanyl, 30 grams.

7            And in response -- and that was part of a communication

8    that the defendant didn't have with that individual.  His next

9    statement to that individual was, quote, I need my stuff or

10   she's going to get hurt, bro.  He then texted him.  And this

11   occurred on -- excuse me -- November 19th.

12           On November 20th, the defendant texted the same

13   individual again to try to get his aid in finding this person

14   who had ripped him off for 30 grams of fentanyl.  And the

15   defendant stated, quote, if I don't hear back from her, I will

16   have no other choice but to violate her or her daughter.  You

17   know how this game works.  I don't play none of that shit.

18   I'll go to jail for mines.  And that occurred on November 20th.

19           And on November 23rd, the defendant had another text

20   exchange in which he stated what -- what -- he asked whether it

21   was work on that person from the individual he's trying to have

22   hunt her down.  And he also stated in that request, and this

23   is -- defense has this.  He stated, quote, I really don't want

24   to go to her daughter's house, but she's leaving me no choice,

25   bro.

1          So in this case, your Honor, the defendant was engaged

2     in racketeering with a highly violent gang.  He was involved in

3     a murder with that gang, and the information received from his

4     phone is consistent with him having information about potential

5     witnesses, which clearly raises issues about obstruction and

6     intimidation.

7          In addition to that, defendant also was involved in

8     trafficking fentanyl, a highly dangerous drug.  And when

9     someone took 30 grams of that fentanyl from him, he is prepared

10    to have a person hunt that person down.  And the defendant in

11    open text messages stated that he would commit violence not

12    only against that person, but against potentially their family.

13         We believe given those facts, your Honor, that

14    this -- the defendant's actions merit detention because of the

15    danger they present to the community and also the danger they

16    present of obstruction.  And on that front, this is not as the

17    Court's aware -- this is a racketeering crime.  The individual

18    that was involved in the murder that we discussed was a minor.

19    There are still numerous individuals at Heath Street that are

20    associated with the Heath Street Gang, including several

21    minors.

22         The defendant being put on the street, there is no way

23    to control his contact with those individuals on the street.

24    And the defendant is well aware that he's looking at a

25    potential significant sentence if he's found to be liable for

1    the murder conspiracy.

2           The drug conspiracy itself carries a 10-year sentence,

3    but the murder conspiracy could theoretically carry a sentence

4    of up to life.  So given all those facts and the fact that he

5    had the information about witnesses, we don't believe that

6    release is appropriate.

7           THE COURT:  Okay.  Thank you.

8           MR. BENZAKEN:  Thank you, your Honor.

9           Your Honor, discovery is still ongoing, and I'm not

10   able to address all the allegations in full.  I'm still

11   learning about it, but I think it's significant that -- I'll

12   first address the -- the homicide that's at the issue here.

13          This is a homicide that occurred on June 7, 2021.

14   There is an individual who has been charged by it.  I think

15   it's significant that notwithstanding whatever the state courts

16   have learned about this and all the information they collected

17   about it, Mr. Avalo and Mr. Campbell, who was supposedly with

18   this night have been charged in any form of any connection with

19   it, not even an accessory after the fact, which would require

20   far less proof than the murder allegation or the -- or

21   participation of conspiracy to commit murder that the

22   government's suggesting exists.

23          We also have Mr. Avalo's photo from 2021, which

24   frankly does not benefit him when we're talking about various

25   allegations with respect to the drugs, but I think it's

1    significant that with respect to this homicide on June 7, 2021,

2    we have no information about Mr. Avalo being in contact with

3    the primary suspect, with any individuals about this incident.

4    In fact, what we know from this and what I can tell from this,

5    and what I have been given so far is a homicide occurs in

6    Mission Hill.  The gentlemen who has been -- the young man who

7    had been charged with it then walks a great distance from

8    Mission Hill back to Jamaica Plain to the Heath Street

9    projects.  That's a significant distance.

10        So I already think it's interesting this

11   characterization of sort of a getaway driver is -- is not

12   accurate, because it's nowhere close to the scene or close to

13   the location.  It's very, very far back from the fact.

14        Mr. Avalo is a passenger in a car driven by another

15   person.  There is no indication that he had any knowledge about

16   maybe that other person made an arrangement to pick someone up.

17   Maybe they got a text right beforehand to pick someone up.  We

18   don't know.  There's no evidence about how this communication

19   was arranged and what called this individual to go and get in

20   that car at this point.

21        But given that Mr. Avalo is a passenger, or he's not

22   in control of that vehicle, I think to impute to him knowledge

23   of the circumstances involving the -- the suspect in the

24   homicide, I think, is -- is a stretch.  I think particularly

25   given the lack of any evidence of communication given that we

1    have his cell phone from that time.

2         What we have -- what they have on Mr. Avalo from that

3    day is he's in a car with Mr. Campbell, very far from the scene

4    of the murder or -- or the homicide, whatever it's

5    characterized as, very far from that location.  He's in a car

6    in a parking lot without any information about what he's doing.

7    There are a lot of people in this parking lot.  The video of

8    the damages that I've seen show this to be a very busy scene.

9    You see lots of people milling around.  This appears to be an

10   area where people socialize and hang out.

11        So as I view these images and this information, I

12   think there's a lot missing.  Right.  It is certainly not a

13   good thing to be in a car with someone after they commit a

14   homicide, but to suggest they had knowledge or were involved

15   and had some sort of role in it, I think requires more

16   connection.

17        There is also we have -- there is some evidence about

18   there being some address information on his phone, but what

19   there's no information about is who these people are, whether

20   or not the individuals were known and perhaps friendly or

21   associated with -- with various parties and simply had

22   information.  We don't know if that was just something that was

23   given to him that he -- that he simply received.  But there's

24   no indication that he's sharing this information, conveying

25   this information to anyone.

1          There's no indication that he shared this with also

2     the added information of what it is and how people should act

3     on it.

4          I think, although it's not great that he has this

5     information on the phone, I think without information about how

6     it got there and how it was used I think to impute to him as

7     sort of a nefarious purpose is -- is unfair.

8          Similarly, with respect to the drug allegations, your

9     Honor, I do recognize that there are -- you know, Mr. Avalo

10    does have a much more serious issue to contend with here.  I

11    think there -- I would concede that there -- there is evidence

12    of activity by -- by Mr. Avalo consistent with narcotics

13    activity, but this is all surrounding -- surrounding 2021.

14         But we don't have any information about his activities

15    involving along these lines afterwards.  Right.  Mr. Avalo is

16    only arrested earlier this year, so from 2022, 2023, and into

17    2024, there's no indication this activity is continuing, no

18    implication what -- that Mr. Avalo is involved in any criminal

19    activity whatsoever.  There's nothing about him after 2021.

20         Also significantly, although there were some rather

21    unpleasant exchanges with him, I think what is significant is

22    there's no indication that anything came of it.  There's no

23    indication that there was actually any violence occurred with

24    respect to anyone.  There's no indication of any violent

25    interactions with anyone or even fights or quarrels.  You know,

1    someone venting to another person and using horrible language

2    again does not benefit Mr. Avalo, but it does not necessarily

3    indicate that there was action consistent with these words that

4    were voiced to -- to someone else that he knew.

5           This does not affect the record at that third party

6    directly, so just the belief that he would necessary act on it

7    or that there was a direct threat to this person, I think,

8    is -- is -- is not -- there's not grounds to find that at this

9    time.

10           Ultimately, however, your Honor, I still suggest, not

11    withstanding all of the allegations, particularly given that

12    Mr. Avalo has no allegations against him since 2021, and all of

13    this information presumably has been known to law enforcement,

14    available to law enforcement since 2021, but no attempts to

15    arrest him or charge him in connection with these suggest that

16    Mr. Avalo is someone who can still remain free and living in

17    the community and -- and -- and not raise concerns about posing

18    a danger to others.

19           I think the bail report shows that there are numerous

20    conditions that can be imposed on Mr. Avalo that would satisfy

21    all conditions -- all concerns that your Honor should have with

22    respect to his release.

23           Mr. Avalo is -- made arrangements to live now with his

24    sister in Franklin, to go far away from Boston.  He's not

25    seeking to return to his prior residence in Charlestown,

1   although he is going to want to be involved with his children's

2   life.

3         He's seeking to live with his sister, who wrote the

4   letter to this Court, in Franklin, far from -- far from the

5   area.  He's asking to live there along with his seven-year-old

6   son.  He's seeking to live on home confinement with the

7   opportunity to seek employment, and if he obtains full-time

8   employment, because he was working prior to this.  He was

9   working -- he was working at a temp agency doing construction

10  work.  He had a job assignment in New Hampshire where he had

11  been at consistently, and there had been discussion about

12  actually making that a permanent position for him back in

13  January of last year.

14        He was arrested shortly thereafter so obviously that

15  did not happen.  He hopes that can be revived, and he will

16  explore that, but that's what he was doing in 2023 prior to his

17  arrest.

18        He was working, and he was very much involved with his

19  children's life.  His two daughters, and I think this is also

20  something significant on what's going on in his life.  His two

21  daughters were two years old.  They're both autistic, and they

22  require significant care, and they have to be brought to

23  their -- and they require significant care both individually

24  and for medical care.

25        If he is not working, he's going to also be

1    able -- he's going to be watching his children.  If he's on

2    home confinement his partner is going to bring his two

3    daughters to the home where he will be able to watch and spend

4    time with them.

5          We also expect he'd be fitted with a GPS bracelet to

6    ensure that he does not leave the location.  And Mr. Avalo will

7    be also open to any sort of communication restrictions placed

8    on him to the extent this Court has concerns that if he be

9    communicating with anyone that he shouldn't be or about

10   subjects he should not.

11         Your Honor, for three years he has been out,

12   and -- and -- and there's no suggestion of any criminal

13   activity during those -- those -- those three years.

14         One thing that also happened during that time that I

15   would suggest is an important factor for Mr. Avalo is he -- he

16   stopped during -- he stopped during this period taking his

17   mental health medication.  He had been on mental health

18   medication since he was a teenager for various mental

19   illnesses.  He made an attempt to get off of it, try to live

20   without this medication, but he also recognizes that it is not

21   to his -- that does not endure to his benefit.

22         One of the things he's seeking to do if he's released

23   is to reengage with mental health treatment, reestablish his

24   medication regimen and probably address his mental health

25   issue.

1          THE COURT:  All right.  Thank you.

2          MR. BENZAKEN:  Thank you, your Honor.

3          MR. CROWLEY:  Could I clarify one point, your Honor?

4          THE COURT:  Yes.

5          MR. CROWLEY:  And I could provide the Court with the

6     affidavit, if they want, for the complaint, but the defense

7     argument that nothing occurred since 2021, in footnote 2 of the

8     complaint, it was noted that Mr. Avalo was stopped with his

9     codefendant, Mr. Pimentel, by Massachusetts State Police on

10    June 19, 2023.

11         Mr. Pimentel was in possession of a blue bag that had

12    pills in it consistent with fentanyl pills.  So that tied in

13    with the other evidence to claim that the defendant was simply

14    working during that period we believed, and that's set forth in

15    the affidavit.

16         THE COURT:  All right.  Thank you.

17         All right.  I -- I'm going to take this under

18    advisement.  There's been a lot that has been presented to me,

19    and I do, in fairness to both sides, want to think about it a

20    little more deliberately.  I will though, Mr. Avalo, just share

21    with you some of the concerns I have from the information that

22    has been presented to me.

23         Your record is puzzling.  On the one hand, you don't

24    really have any convictions, but you have a long record that

25    reflects steady involvement with law enforcement and the

1    criminal justice system going back to your years as a juvenile.

2    A 13-year span from the age of 13 to 26, there are only two

3    years calendar wise where you didn't have an entry on your

4    record.  And in some of those years you had multiple entries.

5    And that's all the way from basically up through 2023.

6           So the idea that there's no suggestion of your

7    engaging in any criminal conduct after 2021 is belied by the

8    record.  But again, I'm noting no convictions, which is in your

9    favor, but it's more the fact that you appear to have made

10   decisions that for some reason brought you into contact with

11   law enforcement with the system.  That's concerning.

12          The government has also presented evidence that under

13   one scenario suggests possible obstruction of justice in this

14   case, which is a very serious concern because when the

15   government comes before me and says we want you to consider

16   detaining somebody because there's a risk of obstruction, we

17   don't -- we don't entertain those arguments as a general

18   concern.  Rather, we require specific evidence in the records

19   suggesting this particular individual could conceivably try to

20   interfere with the government's ability to continue

21   investigating the case or prosecuting the case.  I'm not making

22   a finding that way one -- one way or the other, but I am noting

23   based on information the government has presented there is a

24   concern that if you were released your release could pose a

25   risk of obstruction.  That is something I have to consider.

1          Also the government says, just as practical matter, if

2    you were released it might be difficult to enforce a condition

3    that you not have any contact directly or indirectly with

4    anybody who could be viewed as a -- as a witness or a victim or

5    a codefendant in this case.

6          Now, your lawyer says he would propose that you

7    basically live far enough away that that's not really a

8    concern.  That's something I do want to consider and as well to

9    consider whether in this modern time -- in these modern times

10   whether that distance, that geographic distance, is enough to

11   give me a comfort level that we wouldn't have to be worried

12   about that.

13         So I -- I am going to take this under advisement, but

14   I -- I just want you to understand those are some of the things

15   I have to work through.  Until I can make a decision one way or

16   the other though you will have to remain in the custody of the

17   marshals.  All right.

18         So for now, Mr. Avalo may be remanded to the custody

19   of the marshals.

20         We'll be in recess on this matter, and we'll move to

21   the next one.

22         THE COURT:  Thank you.

23         MR. CROWLEY:  Thank you, your Honor.

24         (At 3:26:24 p.m., the audio recording ended.)

25

1                     C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4     certify that the foregoing transcript is a true and accurate

5     transcription prepared to the best of my skill, knowledge, and

6     ability from the official electronic sound recording of the

7     proceedings before Chief Judge Magistrate Donald L. Cabell in

8     the above-entitled matter.

9

10

11         /s/ Marianne Kusa-Ryll                    3-6-2025
           Marianne Kusa-Ryll, RDR, CRR             Date
12         Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25