UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 23-cr-10186-ADB |
| | ) | |
| JOAN AVALO-QUEZADA | ) | |

**SUPPLEMENT TO DETENTION ARGUMENT**

The United States Attorney respectfully submits the following supplement to the May 2, 2025, hearing on Defendant Avalo's detention appeal.

I. **The Recording of the Parking Lot**

Per the Court's request, Exhibits 1a and 1b are a recording of Defendant Avalo and Keonte Campbell arriving in a car driven by Campbell and meeting with the juvenile shooter on June 7, 2021. The recording is from a security camera in the Mildred C. Hailey Apartments in Boston – the home base of the Heath Street Gang. The video has been reformatted to be more easily played on commercial players.

At the detention appeal hearing, Defendant did not dispute: (1) the June 7, 2021, murder occurred in the Mission Hill area of Boston – the territory of the Mission Hill Gang, one of the Heath Street Gang's primary rivals; (2) the juvenile shooter has been charged with the murder in the Massachusetts state courts; (3) Defendant was the passenger in the vehicle identified in Exhibits 1a and 1b along with Keonte Campbell; and (4) the juvenile shooter got into the vehicle with Defendant and Campbell after the shooting murder and left the area. Defendant challenges that there is sufficient proof that he was involved in the murder conspiracy.

The facts establish that Defendant and Campbell were involved in the murder conspiracy by facilitating the shooter's flight as follows:

1. The vehicle with Defendant and Campbell backed in and parked facing outwards in the parking lot at approximately 8:37 p.m., which was *approximately 4 minutes before the shooting occurred* (the shooting occurred per Shot Spotter at approximately 8:41 p.m.);

2. Defendant and Campbell stayed in the front seat vehicle and did not interact with anyone else;

3. The vehicle was kept running the entire time the vehicle was in the lot;

4. The vehicle's headlights were on the entire time the vehicle was in the lot;

5. Campbell can be seen with a cellular phone in his hand before the arrival of the shooter;

6. At approximately 8:54 p.m., around 12 minutes after the shooting, the shooter was recorded walking towards the parking lot;

7. *Within approximately 10 seconds of the shooter reaching the parking lot, Campbell turned on the interior dome light of the vehicle thus illuminating the passenger compartment of the vehicle* – this act is consistent with Campbell highlighting the vehicle so that the shooter could identify it in the lot at night;

8. The shooter was thereafter recorded on security footage walking along the perimeter of the parking lot looking at his phone;

9. While looking at his phone, the shooter walked past the vehicle with Defendant and Campbell, and then walked along the side of the parking lot away from the vehicle;

10. After walking the length of the lot, the shooter turned around 180 degrees and walked back to the area of Defendant and Campbell – again looking at his phone and looking at the illuminated vehicle;

11. The shooter approached the vehicle with Defendant and Campbell and stood next to the driver's side for approximately one minute before getting into the back seat of the vehicle;

12. During this time period between arriving and getting into the vehicle, the shooter received a text message with the home address of a Heath Street Gang member who was living in Quincy;

13. The vehicle, with all three individuals, pulled out and began to leave the parking lot before stopped in front of Defendant's vehicle, which was parked in the same lot. Defendant got out of Campbell's vehicle carrying a whitish object;

14. Defendant accessed his car and then spent approximately a minute in the passenger compartment of his car (a time period consistent with concealing something in his car) before returning to Campbell's vehicle; and

15. The vehicle then drove out of the lot.

These facts support that Defendant and Campbell were involved in a murder conspiracy by acting as the getaway drivers for the shooter's flight from Boston following the gang-related murder in Mission Hill territory.

As noted by the government at the appeal hearing, investigators recovered notes from a phone used by Defendant, which were dated July 26, 2021 – the month after the above murder. These notes included three addresses which investigators have tied to individuals who could have been witnesses to aspects of the murder or had information about the murder. There is no viable reason for Defendant to have these addresses tied to possible witnesses except for intimidation or obstruction purposes. At the hearing, Defendant presented no argument as to why he possessed the address information. Also, as noted at the hearing, the shooter was arrested on state charges on or about December 11, 2013, pursuant to a state investigation of the murder. Three days later, Defendant spoke to the shooter in a recorded jail call and made comments consistent with discussing witness intimidation and obstruction of justice.

    **II.**    **Defendant's Fentanyl Trafficking**

Defendant was involved in significant fentanyl trafficking in Maine in 2021 and continued to engage in trafficking fentanyl through at least the middle of 2023 as discussed during the detention hearing on May 2, 2025. As noted during the hearing,

3

Defendant was involved in supplying street dealers in Maine with fentanyl and the conspiracy involved well over 400 grams of fentanyl being distributed in a period of approximately four months.

During this period, Defendant was ripped off by a woman for 30 grams of fentanyl and thereafter sought to recover his losses through threats of violence against the alleged thief and her daughter.  *See* Exhibit 2 (text communications from Defendant to Jacob Lyford – his co-defendant in case No. 24cr10281-IT).  Defendant contends that these threats should be disregarded as to the danger he poses to the community.  To the contrary, they clearly show the danger Defendant presents to the community pursuant to his criminal activities.  On this point, as set forth below, Defendant tasked Lyford, *who was a drug abuser with a violent criminal record*, with getting Defendant's money back – an act which by its very nature raises a significant possibility of violence.

On November 19, 2021, Defendant texted Lyford: "How [victim's name] get my number??? She tricked me into giving her 3 fin nails [30 grams of fentanyl] saying you was working with her."  *See* Ex. 2 at 000366.  Defendant followed up: "I need my stuff or she's gonna get hurt bruh."  *Id*.  Defendant told Lyford: "Find her for me please I really need my stuff she's in woodland acres with fat old guy."  *Id*.  Lyford agreed to look for the woman.  Defendant responded: "Yea lmk ASAP."

The next day, November 20, Defendant texted Lyford: "No luck?"  *Id*. at 000367.  Defendant then texted Lyford: "If I don't hear back from her I won't have no other choice but to violate her or her daughter you know how this game works I don't play none of that shit I'll go to jail for mines."  *Id*.  During the same text exchange, Defendant texted:

4

"Yea please tell him to take everything dude I'm really on fire I really want to hurt her bro I ain't no punk so I'm fired up about this man …." *Id*. at 000368.

On November 23, 2021, Avalo texted Lyford: " … [N]o word on [victim's name]? Really don't want to go to her daughters house but she's leaving me no choice bro." *Id*. at 000381. Lyford responded: "No word homie. Her daughter and her daughter's husband are good friends of mine though. [Redacted name] is a grimey bitch who deserves es what she gets and they also agree. I'm have to ask you as a favor to me to [p]lease be patient and get her directly bro. Please." *Id.* at 000382. Lyford also stated: "She can only stay down for so long in this little town. I'll go knocking on doors tomorrow make that bitch come to you. Watch." *Id*. As noted above, Lyford was a drug abuser with a violent criminal history and Defendant had him hunting down the woman who had allegedly stolen drugs from Defendant. Defendant's argument that these actions do not raise a danger to the victim, and possibly others, does not hold water.

The danger presented by Defendant in his criminal activities is further exemplified in an incident involving an overdose caused by Defendant's fentanyl. On September 30, 2021, one of Defendant's co-conspirators in Maine texted: "… That was a batch of brownies u brought! *Had one of my boys go out and one out to lunch on her way just after I saw u yesterday*." *See* Exbibit 3 (emphasis added). The co-conspirator was relaying to Defendant that the strength of Defendant's fentanyl had resulted in one overdose and another victim being "on her way" to an overdose. Defendant responded: "Lol yea ???" The individual replied: "Ya for real *had to narcan after cpr and shit it was crazy*! Then my girl that drives me was the other one she was out of her mind on tour for hours lmao." (emphasis added). Per this communication, the victim of the fentanyl

5

overdose had been given CPR and Naloxone ("Narcan") to treat the potentially fatal overdose. Defendant responded: "Lol." Defendant then texted: "Wasup tho I need new plays [drug deals] … shits been slow buddy." Defendant's response to an individual overdosing and nearly dying was to seek more customers for the same dangerous drug.

Respectfully submitted,

LEAH B. FOLEY
UNITED STATES ATTORNEY

*/s/ Michael Crowley*
Michael Crowley
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 8, 2025.

*/s/ Michael Crowley*
Michael Crowley