UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Nos. 1:23-CR-10186-ADB |
| v. | ) | 1:24-CR-10281-ADB |
| | ) | |
| | ) | |
| JOAN AVALO-QUEZADA | ) | |

## SENTENCING MEMORANDUM OF JOAN AVALO

Now comes the defendant, Joan Avalo, before this Honorable Court and respectfully submits the following memorandum in support of his request that this Court sentence him to a variant sentence of less than seventy-eight (78) months of incarceration to be followed by three years of supervised release. Such a sentence is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

## BACKGROUND

Mr. Avalo was born and lived almost of his childhood in the Mildred Hailey or "Bromley Heath" projects, living with his sister and brother there. (PSR ¶ 159). He was raised by a single mother, who is disabled, and to the extent that his father was in his life, intermittently, his father's presence carried with it physical abuse. His mother writes that Mr. Avalo "suffered greatly from his father's absence at a very young age." (Ex. B). Mr. Avalo was distraught because he could not remember his father ever "taking him to a park, spending time with him, or his father doing the bare minimum you could ask for from a father like taking you or picking you up from school." (Ex. B). Mr. Avalo struggled with his mental health from an early age, yet did not address or prioritize it.

His family was evicted from the projects, and his mom was planning to move to a shelter around the time that Mr. Avalo first was charged with a crime at thirteen years old. Mr. Avalo believes that his mother was forced to choose between giving Mr. Avalo to the Department of Children and Families and keep her housing or move out. His mother chose to move out, but had difficulty getting accepted into a shelter. Mr. Avalo carries with him guilt for this position he put his mother in.

When they first left the projects, Mr. Avalo would stay at various people's homes with his mother. They first stayed at his aunt's house, but he soon began staying on friend's couches given the extremely limited space. He spent more and more time with friends, around the projects, and in the streets. Although Mr. Avalo did not carry a firearm at this time, when he was seventeen years old, he was a passenger in a car with three other individuals near where two guns were found. Everyone in the car was charged with possession of the firearms, and this charge resulted in Mr. Avalo's commitment to DYS. (PSR ¶ 130).

While Mr. Avalo was in DYS, his brother, who was nineteen years old at the time, was shot in the face. Mr. Avalo struggled with this, his mental health worsened, and given that his family consisted of his mother, brother, and sister, he started focusing on how to financially provide for his family when he got home from DYS. Around eighteen years old, when he left DYS, he was still unhoused, sleeping on couches when he could, and had a survival mentality. He would often go stretches of time without eating. He continued to frequent the projects and began selling marijuana.

Mr. Avalo had his first child in 2016, when he was twenty years old. This did not dramatically change his perspective or behavior; he continued to sell drugs and hang around the projects. In 2020, Mr. Avalo's best friend was shot to death in front of Mr.

Avalo. Dealing with the confluence of stress factors, including his brother, best friend, and financial pressures, Mr. Avalo became addicted to opiates (and was still dependent on opiates when he was charged in this case).

Although he always has enjoyed being a father, Mr. Avalo reflects that he did not recognize the gravity of the responsibility of parenthood until his identical twin daughters were born in 2022, when Mr. Avalo was twenty-five years old. The twins, who are now four years old, have autism spectrum disorder. When his twin daughters were born, Mr. Avalo began the process of extricating himself from the lifestyle that had only caused him harm, and he began to want to be able to provide for his family in a more productive way. Although this was a gradual process, Mr. Avalo began gravitating away from the gang once his twins were born and increasingly sought a lawful lifestyle.

While incarcerated, Mr. Avalo has continued to grow. He completed the Pathways to Recovery program. He remains in contact with his children and family. His children live with their mother in Charlestown, and he speaks to them on the phone frequently. His family notes that Mr. Avalo's "relationship with his children is an important part of who he is." (Ex. B). His son writes that he is looking forward to being able to spend time with his father in person again, including going fishing—which Mr. Avalo does not know how to do—but wants to learn and teach his son so they "can make memories together." (Ex. B). His family often hears Mr. Avalo discuss his desire to "be able to pick up his children from school and see[] their faces light up," and "tuck[] his children into bed." (Ex. B).

His family is going to be there for Mr. Avalo "every step of the way, and [they] are committed to helping him get back on track." (Ex. B). Upon release Mr. Avalo intends to move away from Boston and live with his sister in Northbridge. His sister recently

purchased a home with her partner, and has a room for Mr. Avalo. Mr. Avalo's cousin has also indicated that she can provide him with a place to live. (Ex. B). Mr. Avalo, who previously worked construction, has obtained his OSHA 30 and would like to go back to working in construction and join a union upon his release. He wants to work full-time and stay busy. He hopes to get his Commercial Driver's License. When he is not working, he hopes to spend time with his children. Mr. Avalo understands, as indicated by his brother-in-law, that "returning home would come with responsibility following any conditions imposed by the Court, seek counseling, treatment, education, or other resources that will guide him towards working to be come a responsible and better member of society not only for himself but also for his children." (Ex. B). Mr. Avalo's return "would give him the opportunity to begin repairing [his] relationships, be present for his children, and become the active father and positive influence they need." (Ex. B).

## **MR. AVALO'S ACCEPTANCE OF RESPONSIBILITY**

Mr. Avalo was charged in docket 1:24-cr-10281-ADB with conspiracy to distribute and to possess with intent to distribute fentanyl in violation of 21 U.S.C. § 846 (Count One of the Indictment). Mr. Avalo was charged in docket 1:23-cr-10186-ADB with conspiracy to conduct enterprise affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (Count Five of the Indictment). These two criminal cases were consolidated as to Mr. Avalo. (See No. 1:23-cr-10186-ADB at ECF 530; 1:24-cr-10281-ADB at ECF 360). Mr. Avalo pled guilty to both charges against him. (No. 1:23-cr-10186-ADB at ECF 544; 1:24-cr-10281-ADB, ECF 369).

## **APPLICABLE GUIDELINES**

Mr. Avalo's guideline range should be determined to be 78-97 months. Mr. Avalo dealt drugs, conduct that he accepts responsibility for. This conduct occurred in

connection with his role in the Maine drug enterprise, as charged originally in 1:24-cr-10281, and in connection with racketeering activities as charged in 1:23-cr-10186. His drug dealing activities were his most egregious unlawful activity, and Mr. Avalo maintains that it is this conduct that should drive his sentence. As will be discussed in detail below, Mr. Avalo was not a participant, nor an aider or abettor, in the killing of Mr. Fermin Baez, and he contests the Probation Department and Government's attribution of Mr. Zykaris Hamilton's killing of Mr. Baez to him. Mr. Avalo maintains that a reasonable view of all the evidence as it pertains to Mr. Avalo would support a total offense level of no greater than 27, which is the total offense level using either the drug quantity offense level, or even an accessory after the fact offense level calculation (both 30 before acceptance). Mr. Avalo should be considered a Criminal History Category II, resulting in a guideline range of 78-97 months.

**A. Mr. Avalo's offense level for the drug charge is 30.**

Mr. Avalo accepts that his base offense level corresponding to the quantity of drugs distributed pursuant to the drug conspiracy is 30. See U.S.S.G. § 2D1.1(c)(5)); (PSR ¶ 111).

The two-level enhancement for a credible threat of violence, however, should not be applied in this case. U.S.S.G. § 2D1.1(b)(2); (PSR ¶ 112). Mr. Avalo acknowledges the problematic comments made to coconspirator Lyford via text message. Mr. Avalo, who has mental health struggles, however, was venting about getting ripped off by a customer, and expressing his frustration to Mr. Lyford, a coconspirator. Mr. Lyford talked about it with Mr. Avalo and calmed Mr. Avalo down. Notably, there is no evidence that the individual discussed was in fact threatened—there is no evidence that a threat was communicated to this individual, and no actions were taken in furtherance of it.

**B. Even assuming the Government's proffered evidence is true, the assertions are insufficient to support a conclusion that Mr. Avalo knew about or was involved in the murder of Mr. Baez.**

Mr. Avalo's guidelines should not be premised on any alleged involvement in the killing of Mr. Baez by Mr. Hamilton.

The Government has advanced a theory that Mr. Avalo "facilitated" the "gang-related murder" of Mr. Baez and then, along with co-defendant Keonte Campbell, acted as "get-away drivers" for Mr. Hamilton. "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). As Mr. Avalo was not present nor the principal in the offense, the Government would need to prove that he was an aider or abettor in the offense. "The federal aiding and abetting statute, 18 U.S.C. § 2, states that a person who furthers—more specifically, who 'aids, abets, counsels, commands, induces or procures'—the commission of a federal offense 'is punishable as a principal.'" Rosemond v. United States, 572 U.S. 65, 70 (2014), quoting 18 U.S.C. § 2. The statutory section "reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." Id. It requires proof that a defendant "(1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Id. at 71.

In Rosemond, the Supreme Court explored how "how those two requirements—affirmative act and intent—apply in a prosecution for aiding and abetting a § 924(c) offense" and concluded that proof of a defendant's advance knowledge of the requisite facts of the crime are required for a conviction. Id. at 71, 78. This is because a conviction is only permitted if a defendant had the knowledge to make the "relevant legal (and indeed, moral) choice" to engage in the crime, and that where "an accomplice knows beforehand of a confederate's design to [commit the offense], he can attempt to alter that

plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid" in the crime. Id. at 78.

Following Rosemond, the First Circuit has considered the advance knowledge requirement of the elements of the aiding and abetting statute, and has held that mere presence or mere association to be insufficient to establish aiding and abetting. See United States v. Rodriguez-Martinez, 778 F.3d 367, 371-373 (1st Cir. 2015). And as previously established in this Circuit, the requisite knowledge in a murder prosecution for aiding and abetting requires proof that accomplice "'consciously share[]' [the principal's] criminal design, associated himself with it, and actively sought to ensure its success." United States v. Mangual-Corchado, 139 F.3d 34, 44 (1st Cir. 1998) (holding that conviction as accomplice to murder required "proof beyond a reasonable doubt that [the accomplice], *before the murder occurred,* consciously shared [the principal's] intention to kill [] and sought to ensure the success of the criminal enterprise by operating" the getaway vehicle).

While the Government uses conclusory and loaded terms such as "facilitated" or "get-away drivers" because such terms advance its theory, such characterizations of the evidence are not supported. The Government's factual summary establishes, at best, that Mr. Hamilton killed Mr. Baez and later entered a vehicle occupied by Mr. Campbell and Mr. Avalo. The Government's evidence fails to establish that Mr. Avalo had prior knowledge of the killing, learned of the killing before Mr. Hamilton entered the vehicle, knowingly agreed to assist Mr. Hamilton's escape, or otherwise participated in a conspiracy to kill Mr. Baez. Consideration of this as offense conduct of Mr. Avalo would be based not on evidence but upon speculation and the stacking inferences upon one another.

Mr. Avalo does not dispute that Mr. Hamilton killed Mr. Baez, nor does he dispute the Government's evidence concerning Mr. Lyons, Mr. McDonald-Jones, or the other alleged participants. However, none of those facts establish that Mr. Avalo shared Mr. Hamilton's criminal intent or had any knowledge whatsoever of Mr. Hamilton's actions before or after the homicide. The issue is not whether Mr. Hamilton killed Mr. Baez, but whether the Government has presented evidence establishing that Mr. Avalo knowingly participated in it. It has not.

1. There is no evidence that Mr. Avalo had prior knowledge of the homicide.

The Government's timeline alleges that Mr. Hamilton committed the murder at approximately 8:41 P.M. at 1545 Tremont Street in Mission Hill, more than a mile from the Bromley Heath Housing Development where Mr. Campbell and Mr. Avalo were parked. As an initial matter, while Mr. Avalo did not deny that it was him at his detention hearing, he has not agreed to the identification of him as being the passenger in Mr. Campbell's car on the video. The Government has repeatedly asserted that it is Mr. Avalo, but the video is not so clear that an identification of Mr. Avalo can be made from the video alone, and the Government's basis for establishing Mr. Avalo's identity as the passenger is unknown.

But even assuming that Mr. Avalo is identified as being the passenger in Mr. Campbell's vehicle, the Government identifies no communication of any kind with Mr. Hamilton before the murder that would suggest either of them had advance knowledge that Mr. Hamilton intended to commit a murder. See Rosemond, 572 U.S. at 78. Indeed, it is not just communication between Mr. Hamilton and either Mr. Campbell or Mr. Avalo that is lacking, but communication of any kind with anyone. There are no communications between Mr. Hamilton and anyone else, or communications between

anyone else and either Mr. Campbell or Mr. Avalo that established their advance knowledge of Mr. Hamilton's intentions, such as Mr. McDonald-Jones and Mr. Lyons who appeared to be involved in the planning. (PSR ¶ 89). And even if the Government lacked access to specific statements because they were encrypted or not captured in a wire intercepts, the Government has not even shown that fact of communication between Mr. Hamilton and Mr. Campbell or Mr. Avalo, communication between Mr. Hamilton and anyone else, or communication between anyone else and Mr. Campbell or Mr. Avalo that would support an inference that there as an opportunity for such a communication to be made.

Equally significant, the Government identifies no evidence that Mr. Hamilton communicated with Mr. Campbell or Mr. Avalo after the shooting to tell them what had occurred. The Government's theory necessarily assumes that Mr. Campbell and Mr. Avalo somehow learned that Mr. Hamilton had just committed a murder before allowing him into the vehicle. Yet the Government points to no evidence establishing when, how, or from whom either individual allegedly acquired that knowledge. There is no witness testimony, recorded conversation, cellular communication, or admission supporting such an inference. Instead, the Government simply assumes that because Mr. Hamilton entered the vehicle, everyone inside must have known what he had done. That conclusion is unsupported by the evidence.

Finally, Mr. Avalo is the passenger in Mr. Campbell's vehicle and not in control of Mr. Campbell's actions. Thus, to the extent that the Government urges this Court to infer from the timing of Mr. Campbell's parking of his car that he had advance knowledge of Mr. Hamilton's intentions, there is no basis to impute that knowledge to Mr. Avalo. There is no evidence of any communication between Mr. Campbell and Mr. Avalo, so to assume

that Mr. Avalo was told anything about the reasoning for Mr. Campbell's actions, or that Mr. Avalo was told anything other than that Mr. Campbell needed to give someone a ride, would be speculative. The suggestion that Mr. Avalo's advance knowledge of Mr. Hamilton's intention to kill could be inferred from this set of facts is pure speculation, proof of which does not even satisfy the preponderance of the evidence test.

2. <u>There is no nexus between Mr. Campbell's car being present at the Bromley Heath Housing Projects and the homicide</u>.

The Government wrongly suggests that Mr. Campbell's parking of his car at the Bromley Heath housing projects at a time close to when Mr. Hamilton killed Mr. Baez established a nexus between Mr. Campbell, Mr. Avalo, and the homicide.

The Government has explained that "the Heath Street Gang began in what is now known as the Mildred C. Hailey Apartments, a public housing development located in the Jamaica Plain section of Boston (the "Mildred C. Hailey Apartments" or the "Development")," and that "Heath Street Gang members/associates routinely congregate around 49 Horan Way within the Mildred C. Hailey Apartments". ECF No. 64-1 at ¶¶ 7, 8. The Bromley Heath housing projects are essentially the home base and locus of operation of the gang. For members of the gang, the housing project is where members of the gang would necessarily seek refuge.

Mr. Hamilton committed the homicide in the Mission Hill area of Boston approximately a mile and a half from the Bromley Heath housing projects. The Mission Hill neighborhood was rival gang territory, and Mr. Hamilton was in jeopardy from other gang members while present there and at risk of being apprehended by law enforcement due to his role in the shooting of Mr. Baez. To the extent that Mr. Hamilton needed assistance with his getaway, that assistance was needed in the Mission Hill area following

the homicide and it would have been needed to get Mr. Hamilton to a point of safety such as the Bromley Heath Housing Projects.

Once Mr. Hamilton had arrived at the Bromley Heath housing projects, he was safe. This was his gang's territory and his place of refuge, and this is where he needed to get to after killing Mr. Baez. The fact that he may have gotten a ride from Mr. Campbell from the housing project thereafter does not aid or abet Mr. Hamilton's killing of Mr. Baez. Mr. Hamilton's killing of Mr. Baez was a completed crime. Mr. Campbell's giving Mr. Hamilton a ride from the housing projects where Mr. Hamilton was already safe and secure to a gathering of gang members in Quincy has no nexus to Mr. Hamilton's actions and did not assist Mr. Hamilton in his already completed killing of Mr. Baez.

Significantly, the Government does not suggest that Mr. Campbell and Mr. Avalo helped Mr. Hamilton abscond and go into hiding. Mr. Hamilton did not leave the area; instead, Mr. Hamilton purportedly went to Quincy for a social gathering with other gang members after which they all returned home, including Mr. Hamilton. Mr. Hamilton did not go into hiding and it appears that he essentially led his normal life following his killing of Mr. Baez. The Government thus can offer no rationale or explanation for why the act of driving Mr. Hamilton from the housing projects for a gathering that evening from which Mr. Hamilton later returned constitutes an affirmative act with the requisite knowledge to establish aiding and abetting. There is simply no nexus between Mr. Hamilton's killing of Mr. Baez, and Mr. Campbell's act of driving Mr. Hamilton (while Mr. Avalo was a passenger) from the Bromley Heath Housing Projects to a gathering in Quincy.

3. The behavior of Mr. Hamilton in the parking lot suggests a lack of foreknowledge by Mr. Campbell and Mr. Avalo.

The Government's theory is further undermined by Mr. Hamilton's own conduct upon arriving at the parking lot. Mr. Hamilton approached the lot while looking at his cellular telephone, walked past Mr. Campbell's vehicle, continued walking the length of the parking lot, turned around, and then returned before approaching the vehicle.

Those actions are inconsistent with the notion that Mr. Campbell was knowingly serving as Mr. Hamilton's prearranged getaway driver. If the pickup had been coordinated in advance, there would have been no apparent reason for Mr. Hamilton to search for the vehicle or walk past it before ultimately returning. Nor did Mr. Campbell or Mr. Avalo get out of the vehicle and call out to Mr. Hamilton as he walked past it. Rather than supporting the Government's theory, the parties' conduct shows Mr. Hamilton's uncertainty about the car's location and suggests that he did not have prior plans to meet Mr. Campbell.

4. The Government engages in speculation by improperly drawing negative inferences from ordinary innocuous conduct.

The Government similarly attributes sinister significance to entirely ordinary conduct. The Government contends that Mr. Campbell's vehicle remained running with its headlights on and that Mr. Campbell activated the interior dome light shortly before Mr. Hamilton entered the vehicle. From these facts, the Government concludes that Mr. Campbell was intentionally signaling Mr. Hamilton to identify the vehicle. The Government is speculating and no evidence supports that conclusion. The Government has no witness, recording, or other evidence establishing why the dome light was activated, or whether Mr. Hamilton even observed it. The Government's interpretation is

merely one of several possible explanations and is no more supported by the evidence than any innocent alternative.

5. <u>There is no basis to find that Mr. Avalo secreted a firearm in his vehicle</u>.

Likewise, the Government relies heavily upon the fact that Mr. Avalo exited Mr. Campbell's vehicle while carrying what it describes as a "white object" and placed it inside another vehicle associated with him. From this observation, the Government concludes that the object was "consistent with" the firearm used in the murder. That conclusion is entirely speculative and there is no basis to attribute nefarious intent to his action at all. The object cannot be identified from the video. No firearm was observed. No firearm was recovered. There is no forensic evidence, witness testimony, ballistic evidence, fingerprint evidence, DNA evidence, or statement by any participant linking that unidentified object to the murder weapon. The Government's conclusion rests solely upon speculation. Simply because an unidentified object could be consistent with a firearm does not constitute evidence that it actually was one.

Indeed, given the evidence of Mr. Avalo's marijuana dealing activities at the Bromley Heath Projects with co-defendant Cirino in June 2021, see PSR ¶ 34, it is more likely that Mr. Avalo was placing his marijuana stash in the car. Where Mr. Campbell was driving to a gathering in Quincy where other Heath Street members were present, and where there is a risk of law enforcement interaction whenever there are gatherings of such kind, it would make sense that Mr. Avalo secreted his marijuana supplies before traveling to Quincy.

6. The purported witness information on Mr. Avalo's phone more than a month after the homicide fails to establish that Mr. Avalo had knowledge of or shared intent for the homicide.

The Government's evidence regarding the July 26, 2021 notes found on Mr. Avalo's phone does not materially advance its position. The Government states only that the notes contained addresses allegedly associated with individuals who "could have been" witnesses to the murder. It does not define what this means, not does it give more description of who these witnesses were or establish that they were in fact witnesses. The Government could be taking a sweeping view of the universe of witnesses and characterizing other Heath Street gang members or affiliates as "potential witnesses", but offers no information to permit this Court to independently assess this characterization. The Government offers no evidence establishing when those addresses were entered into the phone, why they were recorded, whether Mr. Avalo personally created the notes, whether he knew the individuals were potential witnesses, or whether those individuals were known to him for entirely unrelated reasons. Without such evidence, the existence of those addresses has little probative value and does not support an inference that Mr. Avalo knowingly participated in a murder conspiracy, but more particularly, whether he had advance knowledge of the killing.

7. Mr. Avalo was not the operator of the vehicle and had no control over it, such that there is no basis to believe he acted with the intent to assist Mr. Hamilton.

Finally, the Government's theory ignores Mr. Avalo's actual role. He was not the driver of the vehicle. He exercised no control over where Mr. Campbell drove, when the vehicle stopped, or whether Mr. Hamilton entered it. The Government's evidence fails to establish that Mr. Campbell himself possessed the requisite knowledge and intent to knowingly facilitate Mr. Hamilton's escape and the evidence against Mr. Avalo is even weaker. As a passenger, he was removed from any decision-making and the Government's

attempt to attribute Mr. Hamilton's conduct to Mr. Avalo therefore rests on speculation and not proof.

8. <u>There is no basis to attribute the killing of Mr. Baez to Mr. Avalo.</u>

The Government's overall reasoning essentially relies upon impermissible pyramiding of inferences. Because Mr. Hamilton committed the killing, the Government infers that Mr. Campbell knew about it. Because Mr. Campbell allegedly knew, the Government infers that Mr. Avalo also knew. Because Mr. Avalo allegedly knew, the Government infers that he agreed to assist Mr. Hamilton's escape. None of these conclusions are supported by direct evidence, and each depends entirely upon accepting the preceding unsupported inference. Circumstantial evidence may support reasonable inferences, but it does not support a finding of knowing participation through the cumulative stacking of speculative assumptions.

Ultimately, the Government's evidence may establish that Mr. Hamilton committed the murder of Baez. It may establish that Mr. Hamilton later entered a vehicle occupied by Mr. Campbell and Mr. Avalo. What it does not establish is the critical missing element—that Mr. Avalo knew about the murder, agreed to assist Mr. Hamilton, or intentionally participated in the crime. The Government's factual summary repeatedly substitutes conjecture for evidence and inference for proof. Even accepting every factual assertion in the Government's summary as true, the evidence falls well short of establishing that Mr. Avalo had advance knowledge of the killing and knowingly participated in it.

**C. Accessory After the Fact**

In its responses to the defendant's objection to the pre-sentence investigation report, the Government wrote "even if the Defendant were able to show lack of knowledge sufficient for the murder [the evidence is clearly to the contrary], he would be liable for the murder as an accessory after the fact. See United States v. Sandoval, 6 F.4th 63 (1st Cir. 2021); see also Guidelines Section 2X3.1." While Mr. Avalo disagrees that the Government has even proven that he had the requisite knowledge and intent to be held responsible even as an accessory after the fact to Mr. Baez's killing, Mr. Avalo would at least acknowledge that accessory after the fact is a more reasonable characterization of Mr. Avalo's suspected conduct.

U.S.S.G. § 2x3.1 provides that in a case alleging murder, the base offense level is "not more than 30" except in a "case in which the conduct is limited to harboring a fugitive," in which case the offense level is 20. In Mr. Avalo's case, his conduct would appear more in line with "harboring" where he was only involved in the driving of Mr. Hamilton from the Bromley Heath Projects to Quincy, such that his offense level should be 20. But even if this Court were to treat his conduct as more egregious and fitting under U.S.S.G. § 2x3.1(3)(A), then his offense level would be 30. As argued above, since his offense level would be either lower than, or no higher than his offense level in connection with the drug activities, Mr. Avalo's total offense level should be treated as 27 after acceptance of responsibility.

**D. Mr. Avalo's total offense level should be determined to be 27.**

The appropriate offense level of 30, based on the drug weight calculation, is reduced by three points for Mr. Avalo's acceptance of responsibility for his crimes. See U.S.S.G. § 3E1.1. Mr. Avalo's total offense level based on the drug calculations is therefore

27. When considered together, the drug offense would be the leading charge. When combined with the RICO component, no additional points should be added because the conduct is the same. It does not make sense to enhance the offense level for two separate cases that are not, in fact, separate; Mr. Avalo's criminal conduct is the drug activity across the board.

**E. Mr. Avalo's Criminal History Should Be Considered Category II, Not Category III.**

Mr. Avalo's criminal history should be considered Category II, not Category III. Should this Court disagree or feel constrained to calculate his Criminal History as III, Mr. Avalo asks this Honorable Court to consider that at the very least, his guidelines significantly overstate his criminal history. His history is essentially two continuances without findings and a juvenile commitment.

**<u>RECOMMENDED SENTENCE</u>**

Mr. Avalo seeks a variant sentence of less than 78 months. Mr. Avalo's total offense level should be determined to be 27. With Criminal History Category II, the guidelines would be 78-97 months (if Category III, the guidelines would be 87-108 months). Mr. Avalo submits that his guidelines should be considered to be 27 and Category II (or 27 and Category III, recognizing that that category overstates his criminal history). Mr. Avalo notes that, according to the Judiciary Sentencing Information for defendants whose primary guideline was § 2D1.1 (with fentanyl as the primary drug type), with a final offense level of 27 and Category II, it appears that, during the last five years, the average length of imprisonment imposed was 69 months and the median was 66 months. For defendants whose primary guideline was § 2D1.1 (with fentanyl as the primary drug type),

with a final offense level of 27 and Category III, the average length of imprisonment imposed was 76 months and the median was 73 months.

The 180-month sentence sought by the Government is excessive and disproportional to sentences imposed on other individuals in these cases who have greater culpability than Mr. Avalo. A variant sentence of less than 78 months is sufficient but not greater than necessary to promote the interests of sentencing, particularly when considered in the context of the sentences imposed on others in the cases for which Mr. Avalo pled guilty. 18 U.S.C. § 3553(a).

Mr. Avalo's guidelines are driven by his drug dealing activities, and his racketeering activities did not involve any significant role or leadership positions. Mr. Avalo is not alleged to have held any leadership positions within the Heath Street Gang, he is not affiliated with or alleged to direct or control any clique within the gang, and all of his activities seem mostly directed towards his own self-dealing narcotics activities. Unlike others, he is not alleged to have been present at any incident involving shootings, nor is he alleged to have carried a gun or to have fired a gun himself on any occasion.

Mr. Avalo suggests he exhibits less culpability than co-defendant McDonald-Jones who received an incarcerated sentence of 84 months on the RICO charge, with a Rule 11(c)(1)(C) plea. See 1:23-cr-10186-ADB-10 at ECF No. 464. He had an offense level of 33[1] and the Government sought a 135-month sentence. ECF No. 454 at 1. The Government alleged that he had a leadership role in the gang, and was personally involved

[1] It is unclear to Mr. Avalo why the Government did not seek to hold Mr. McDonald-Jones responsible for the murder of Mr. Baez given the evidence of his prior knowledge and assistance yet pursues it against Mr. Avalo despite significantly less evidence to support an assertion that Mr. Avalo knowingly participated in it.

in multiple shootings, including one where he is alleged to have fired a gun himself. Id. at 4. Moreover, Mr. McDonald-Jones is alleged to have been heavily involved in the planning the Baez homicide and to have driven Mr. Hamilton to Mission Hill to commit the homicide. (PSR ¶ 89). Mr. Avalo's conduct is not as egregious as Mr. McDonald-Jones. This case involves guns in the hands of other people and not in Mr. Avalo's, but, notwithstanding this evidence highly indicative of Mr. McDonald-Jones's advanced knowledge of the homicide of Mr. Baez, the Government suggests that a sentence of 180 months would be appropriate for Mr. Avalo. Such disparate treatment of defendants for their relative role in the offense is not consistent with principles found at 18 U.S.C. § 3553(a).

When this Court also considers the conduct of defendant Keyon Roberson, Trevon Bell, and Michael Riley in fashioning a sentence for Mr. Avalo, the sentence of less than 78 months holds Mr. Avalo accountable for his role in the offense relative to others. This is also the case when this Court considers the sentences imposed on defendants in the drug case. In that case, Mr. Avalo was similarly situated to Mr. Pimental, who ran the Maine operation with Mr. Avalo. Mr. Pimental had an offense level of 30, and after acceptance of responsibility and zero-point offender deduction, had an offense level of 25. He received a 48-month sentence where his sentence range was 57-71 months. See Dkt. No. 1:24-cr-10281-IT-3 at ECF No. 258. Mr. Avalo recognizes that Mr. Pimental has a slightly smaller criminal record than Mr. Avalo; Mr. Avalo recognizes that he is not a zero-point offender, and also has the racketeering component to his case, so he accepts that a higher sentence than Mr. Pimental received that is less than 78 months is appropriate for Mr. Avalo.

## Conclusion

Mr. Avalo submits that a variant sentence of less than 78 months is appropriate, given his offense conduct, relative culpability, and personal history and circumstances. For the reasons stated above, Mr. Avalo moves that this Court impose a variant sentence of less than seventy-eight months of incarceration followed by three years of supervised release.

Respectfully submitted,

Counsel for the defendant,

*/s/ Jason Benzaken*

Jason Benzaken, Esq.
Benzaken, Sheehan & Wood, LLP
1342 Belmont Street, Suite 102
Brockton, MA 02301
(Tel) 508-897-0001
(Fax) 508-587-5455
BBO No. 658869
*jbenzaken@bmswlaw.com*

Dated: October 23, 2026

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion has been served upon the parties to this matter and counsel for the United States through CM/ECF.

*/s/ Jason Benzaken*

Dated: October 23, 2026